1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

7

**DISTRICT OF NEVADA**

8

9  KAMILA PASINA, as Special Administrator    )    2:08-CV-01199-RCJ-(RJJ)
   for the Estate of Fatu Taputu,             )

10                                            )
                   Plaintiff,                 )    **ORDER**

11                                            )
   v.                                         )

12                                            )
   CALIFORNIA CASUALTY INDEMNITY              )

13 EXCHANGE,                                  )
                                              )

14                 Defendant.                 )
                                              )

15 _____ )

16         This is a bad faith insurance action.  Presently before the Court are: Plaintiff's Motion

17 to Strike Expert Witness (#72), Defendant's Motion in Limine (#111, 112, 113), Defendant's

18 Renewed Motion for Summary Judgment (#137), Plaintiff's Motion to Amend Caption (#148),

19 Defendant's Counter Motion to Dismiss (#153), Defendant's Motion for Sanctions (#154),

20 Defendant's Motion for Summary Judgment (#159), Defendant's Emergency Motion to Compel

21 (#164), Defendant's Second Motion in Limine (#174), and Defendant's Renewed Motion to

22 Disqualify Plaintiff's Counsel (#175).  All motions have been fully briefed.  The Court heard

23 oral argument on September 17, 2010.  Trial is currently set for November 5, 2010.  The Court

24 now issues the following order.  IT IS HEREBY ORDERED that: Plaintiff's Motion to Strike

25 Expert Witness (#72) is DENIED as MOOT; Defendant's Motion in Limine (#111, 112, 113)

26 is GRANTED IN PART AND DENIED IN PART; Defendant's Renewed Motion for Summary

27 Judgment (#137) is DENIED; Plaintiff's Motion to Amend Caption (#148) is GRANTED;

28 Defendant's Counter Motion to Dismiss (#153) is DENIED; Defendant's Motion for Sanctions

(#154) is DENIED; Defendant's Motion for Summary Judgment (#159) is DENIED; Defendant's Emergency Motion to Compel (#164) is DENIED; Defendant's Second Motion in Limine (#174) is GRANTED IN PART AND DENIED IN PART; and Defendant's Renewed Motion to Disqualify Plaintiff's Counsel (#175) is DENIED.

## I. BACKGROUND

### A.    Ramirez strikes Taputu while driving Maldanado's vehicle.

On June 21, 2004, Christopher Ramirez was driving Tricia Maldonado's car when he struck pedestrian Fatu Taputu, rendering him comatose.  At the time, the vehicle was insured by a policy issued by California Casualty to Maldonado.  The policy covered liability of up to $15,000.00 per person or up to $30,000.00 per incident.  (*See* Am. Compl. (#47) ¶¶ 7–10; Ans. (#53) ¶¶ 7–10).  Ramirez was driving under the influence.  (Ramirez Depo. 14:6–14, attached as Ex. 1 to Cushing Decl., attached as Ex. B to Def.'s Mot. for Summ. J. (#137)).  Ramirez did not report the accident to California Casualty.  (Kuhn Decl. ¶ 2, attached as Ex. A to Def.'s Mot. for Summ. J. (#137)).  Fatu Taputu eventually died as a result of the accident.  (Am. Compl. (#47) ¶ 10).  Kamila Pasina (the "Special Administrator") was Taputu's guardian ad litem before his death and is the administrator of Taputu's estate.  (*See* Compl. (#47) ¶ 14).

### B.    Taputu makes a policy limit demand on California Casualty.

On June 22, 2004, Maldonado reported the accident to California Casualty.  (Kuhn Decl. ¶ 2).  She stated that Ramirez did not have permission to drive her car.  California Casualty ordered a police report but it was delayed due to the criminal investigation.  (*Id.* at ¶ 3).  On June 23, 2004, Michelle Miner, a California Casualty agent, noted that the vehicle was a total loss, Maldonado had given permission to Remirez to drive it, and that Taputu was in critical condition.  She advised payment of the policy limits.  (Claim Comments 0928–29, attached as Ex. 1 to Pl.'s Opp'n (#139)).  On June 30, 2004, Miner spoke with an officer who said it was definitely a total loss of the vehicle and that Taputu was hospitalized and in critical condition.  (*Id.* at 0928).  That same day, California Casualty agent Jack Salek confirmed that the vehicle was a total loss.  (*Id.*).  On July 9, 2004, Miner learned that Ramirez pled guilty to criminal charges.  (*Id.* at 0927).

2

On August 12, 2004, attorney David Sampson sent Maldonado a letter stating that he represented Fatu Taputu in a claim for damages arising from the accident. Maldonado forwarded the letter to California Casualty. (*Id.* at ¶ 4; Letter from Sampson to Maldonado dated Aug. 12, 2004, attached as Ex. 1 to Kuhn Decl.). On August 23, 2004, California Casualty sent Sampson a letter requesting a police report and stating that it would divulge its policy limits "[u]pon receipt of medical records and/or a signed medical authorization form." (Kuhn Decl. ¶ 5; Letter from Miner to Sampson dated Aug. 23, 2004, attached as Ex. 2 to Kuhn Decl.).

On September 1, 2004, Miner sent Maldonado a letter stating that the claims against her policy may exceed the $15,000 per person, $30,000 per accident limits. (Claim Comments 0926; Letter from Miner to Maldonado dated Sept. 1, 2004, at 1005, attached as Ex. 1 to Pl.'s Opp'n (#139)).

In response to California Casualty's August 23 letter, Sampson sent a letter dated September 13, 2004 via facsimile which enclosed an authorization and a list of medical care providers but no records or addresses of medical care providers. The letter also stated that Taputu would settle for Maldonado's policy limits if California Casualty sent him payment and proof of the limits within two weeks. (Kuhn Decl. ¶ 6; Letter from Sampson to Miner dated Sept. 13, 2004, attached as Ex. 3 to Kuhn Decl.). California Casualty's offices were closed the week of September 13, 2004 and Miner did not receive the letter until September 20, 2004. (Kuhn Decl. ¶ 7).

On September 21, 2004, California Casualty faxed Sampson a letter requesting hospital bills and medical records. (Kuhn Decl. ¶ 8; Fax from Miner to Sampson dated Sept. 21, 2004, attached as Ex. 4 to Kuhn Decl.). Miner appears to have believed that Sampson failed to provide a list of medical providers. (*See* Claim Comments 0926). Sampson responded the next day, stating that he already provided authorization and a list of providers so that California Casualty could request the records themselves. (Kuhn Decl. ¶ 8; Letter from Sampson to Miner dated Sept. 22, 2004, attached as Ex. 5 to Kuhn Decl.). Miner realized that Sampson had listed three medical providers in his September 13 letter. (Claim Comments

3

0925).  California Casualty then requested Taputu's records.  (Kuhn Decl. ¶ 8; Letter from Miner to Univ. Med. Ctr. dated Sept. 22, 2004, attached as Ex. 6 to Kuhn Decl.).  California Casualty also contacted Sampson's co-counsel, Christensen, admitting that Sampson had provided a list of providers in his September 13 letter and informing him that the office was closed for a week and that it would now expedite the claim.  (Kuhn Decl. ¶ 9; Fax from Miner to Christensen dated Sept. 22, 2004, attached as Ex. 7 to Kuhn Decl.).

On October 4, 2004, three weeks after the date of Sampson's demand letter and two weeks after Miner received the letter, California Casualty sent Christensen a release form for his client and a letter stating that a check was sent to him separately.  (Kuhn Decl. ¶ 10; Fax from Miner to Christensen dated Oct. 4, 2004, attached as Ex. 8 to Kuhn Decl.).  On October 15, 2004, California Casualty sent a facsimile to Sampson stating that it had yet to receive the Special Administrator's release and that it needed the signed release before it could issue the check.  (Kuhn Decl. ¶ 10; Fax from Miner to Sampson dated Oct. 15, 2004, attached as Ex. 9 to Kuhn Decl.).  Without hearing back, California Casualty issued a check to the Special Administrator on October 21, 2004.  (Kuhn Decl. ¶ 10;Check record, attached as Ex. 10 to Kuhn Decl.).  When the Special Administrator refused to accept the policy limit, California Casualty stopped payment on the check.  (Kuhn Decl. ¶ 10).

### C.   The Special Administrator sues Maldanado and Ramirez.

On September 30, 2004, Sampson, representing the Special Administrator, sued Maldanado and Ramirez in state court.  In accordance with the terms of Maldanado's insurance policy, California Casualty retained counsel to represent Maldanado and Ramirez. (Kuhn Decl. ¶¶ 11, 14).

On November 5, 2007, Ramirez stipulated to entry of a $1.2 million judgment against him.  The stipulation was prepared by Sampson and made without the involvement of California Casualty.  (Kuhn Decl. ¶ 13).  On January 18, 2008, a jury returned a verdict for Maldanado.  On February 28, 2008, California Casualty paid the Special Administrator $15,000 in exchange for the the estate's full release of claims against Maldanado.  (Kuhn Decl. ¶ 14).

4

**D.    California Casualty sues for declaratory relief.**

According to the Special Administrator's allegations, on January 20, 2005, California Casualty, through attorney Keith Edwards, took an Examination Under Oath of Maldonado to procure testimony that Maldonado did not permit Ramirez to drive her vehicle.  (Am. Compl. (#47) ¶ 36).  On February 7, 2005, Edwards took an Examination Under Oath of Ramirez.  (Examination Under Oath of Ramirez, attached as Ex. 5 to Pl.'s Opp'n (#139)).  Ramirez testified that Maldonado did not limit the extent of the permission she gave him to use her car.  (*Id.* at 10:20–11:19).  California Casualty did not inform Ramirez on the record of his right to counsel at the Examination Under Oath or that attorney James Jackson had been hired to protect his interests and did not inform Jackson of the examination.  (*See* Examination Under Oath of Ramirez).

On February 8, 2005, California Casualty filed a complaint for declaratory relief in federal court asking the court to declare that Ramirez was not a permissive driver under Maldonado's policy.  (Compl. for Decl. Relief, attached as Ex. 3 to Pl.'s Opp'n (#139)).  California Casualty based its complaint on the facts from Maldonado's Examination Under Oath and omitted any mention of Ramirez's Examination Under Oath.  The Special Administrator asserts that California Casualty never provided the court or the defendants a copy of the Examination Under Oath of Ramirez during the declaratory relief action.  She also asserts that Ramirez's attorney was not advised that the examination would be conducted or given an opportunity to attend and was not told the examination had occurred or given a copy of the transcript.  (Pl.'s Opp'n (#139) 9:12–24).

On April 12, 2005, the Special Administrator moved to dismiss.  (Pl.'s Mot. to Dismiss in Decl. Action, 2:05-cv-179 (#5)).  On April 18, 2005, California Casualty opposed the motion.  (Def.'s Opp'n in Decl. Action, attached as Ex. 4 to Pl.'s Opp'n (#139)).  California Casualty did not advise the court or the Special Administrator of Ramirez's Examination Under Oath.  (*See id.*).

On June 8, 2005, the Court granted the Special Administrator's motion to dismiss with leave to amend.  (Order in Decl. Action, 2:05-cv-179 (#5)).  On August 16, 2005, the Court

1    approved the parties' stipulation to dismissal without prejudice.  (Order in Decl. Action, 2:05-
2    cv-179 (#16)).

3        **E.    California Casualty attempts to settle with Taputu's heir in probate court.**

4        While the action by the Special Administrator against Maldonado and Ramirez was
5    pending, on December 19, 2005, California Casualty paid Taputu's son, Owen Fatima,[1]
6    $15,000 under Maldonado's insurance policy in an effort to settle the claim.  (Kuhn Decl.
7    ¶ 12).  California Casualty then filed a motion in probate court to dismiss the estate's claim
8    against Ramirez.  The probate commissioner held that Owen Fatima had no authority to settle
9    the claim on behalf of the estate and recommended denial of the motion.  (Minutes of Probate
10   Ct., attached as Ex. 6 to Pl.'s Opp'n (#139)).  On April 11, 2006, the state district judge denied
11   the petition to approve compromise of claims.  (Order of Probate Ct., attached as Ex. 6 to Pl.'s
12   Opp'n (#139)).

13       **F.    The Special Administrator and Ramirez sue California Casualty in this**
14       **case.**

15        On June 24, 2008, the Special Administrator and Ramirez, represented by Sampson,
16   sued California Casualty in state court.  (Compl., attached as Ex. B to Pet. for Removal (#1)).
17   On September 10, 2008, California Casualty removed to this Court.  (Pet. for Removal (#1)).
18   On May 8, 2009, the Special Administrator and Ramirez filed an amended complaint.  (Am.
19   Compl. (#47)).  The Special Administrator and Ramirez allege that California Casualty acted
20   negligently and in bad faith by failing to settle Taputu's claim for the policy limits.  (*Id.* at ¶ 23).
21   They also allege that California Casualty violated its fiduciary duty and its duty of good faith
22   and fair dealing to Ramirez and that California Casualty committed fraud against Ramirez and
23   against the court in the declaratory action.  (*Id.* at ¶¶ 63–64).  The Special Administrator and
24   Ramirez also allege that California Casualty breached its contract with them and breached the
25   implied covenant of good faith and fair dealing.  (*Id.* at ¶¶ 69, 79).  Finally, they allege
26   California Casualty violated section 686A.310 of the Nevada Revised Statues.  (*Id.* at ¶ 86).

27   _____

28        [1] The name of Taputu's son, Owen, is not clear.  He is sometimes referred to as "Owen
     Tapatu," "Owen Fatima," and "Owen Tipama."

6

California Casualty answered the amended complaint on May 22, 2009. (Ans. (#53)). On November 4, 2009, the Court denied both parties' cross motions for summary judgment, holding that there were factual issues remaining and that a reasonable jury could find that California Casualty acted in bad faith. (Order (#94)). On March 15, 2010, the Court granted the Special Administrator's motion to substitute herself in place of Ramirez and terminated Ramirez as a party to this action because Ramirez had assigned his claims to the Special Administrator. (Order (#135)).

## II. Plaintiff's Motion to Strike Expert Witness (#72)

The Special Administrator moves to strike California Casualty's listing of Judge Timothy C. Williams as an expert witness on its disclosure. Defendant disclosed Judge Williams as a percipient witness and an expert witness. The Special Administrator argues that the Court must strike the expert designation because California Casualty failed to provide a written report by Judge Williams, a list of his qualifications, his compensation, a list of his publications, and a list of cases he testified in pursuant to Rule 26(a)(2)(B) of the Federal Rules of Evidence. California Casualty counters that Rule 26(a)(2)(B) does not apply because Judge Williams is not a witness "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B).

California Casualty appears correct. However, California Casualty de-designated Judge Williams as an expert witness on June 3, 2010. (Def.'s De-Designation (#150). Therefore, the issue is moot and Plaintiff's Motion to Strike Expert Witness (#72) is granted.

## III. Defendant's Omnibus Motion in Limine (#111, 112, 113)

As a preliminary matter, the Court wishes to remind the parties that all in limine rulings are subject to alteration during the course of the trial. With that caveat, the Court grants California Casualty's motions to exclude evidence not produced during discovery, to exclude evidence of other lawsuits against it, and to prohibit counsel from offering personal opinions at trial. Calfiornia Casualty's remaining motions in limine are denied.

### A.   California Casualty's motion to prohibit Sampson from acting as trial counsel

California Casualty moves to prohibit Sampson from acting as plaintiff's counsel because Sampson is the key witness in this matter.  (Def.'s Mot. in Limine (#111, 112, 113) 5:16–20).  According to Rule 3.7 of the Nevada Rules of Professional Conduct, "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless: (1) The testimony relates to an uncontested issue; (2) The testimony relates to the nature and value of legal services rendered in the case; or (3) Disqualification of the lawyer would work substantial hardship on the client."  Nev. R. Prof. Conduct 3.7.

California Casualty states that Sampson will be called to testify as to why he did not send the policy limit demand via certified mail, why he did not provide more support for his initial claims, why he later refused to provide medical records, why he imposed a two week deadline for California Casualty to respond, and why he did not later choose to resolve the claim.  (Def.'s Mot. in Limine (#111, 112, 113) 5:27–6:9).

The Special Administrator argues that Sampson is not a necessary witness and may not be compelled to testify on the areas California Casualty lists.  (Pl.'s Opp'n (#117) 2:2–7).  She argues that the areas of testimony all go to Sampson's motive and are protected by the attorney-client privilege.  (*Id.* at 2:23–4:11).  The Special Administrator also argues that facts of Sampson's communications with California Casualty are undisputed.  (*Id.* at 3:12–13).

The testimony California Casualty seeks from Sampson is mostly irrelevant and possibly privileged.  The Nevada Supreme Court has summarily concluded that appeal of "whether the district court improperly excluded [an insurance company's] evidence regarding [Sampson's] motive" in an insurance bad faith case was "without merit."  *Allstate Ins. Co. v. Miller*, 212 P.3d 318, 335 n.5 (Nev. 2009).  Also, Magistrate Judge Johnston held that Sampson will not be a necessary witness because his motives or the Special Administrator's are not at issue.  (Order (#125) 7:23–8:2, 9:14–15).  Furthermore, the material facts in this case appear to be uncontested.  Therefore, California Casualty's motion to prohibit Sampson from acting as trial counsel is denied.

**B.      California Casualty's motion to trifurcate trial**

California Casualty moves to separate the trial into three distinct phases: (1) liability for and amount of non-punitive damages, (2) liability for punitive damages, and (3) amount of punitive damages.  (Def.'s Mot. in Limine (# 111, 112, 113) 6:9–19).  California Casualty argues that trifurcation will promote judicial economy by potentially eliminating unnecessary issues if no liability is found.  California Casualty also argues that trifurcation will preserve fundamental fairness by preventing jury prejudice on the issue of liability based on evidence of malice, oppression, or fraud.  (*Id.* at 6:20–7:10).

The Special Administrator argues that the issues of breach and punitive damages overlap and judicial economy would be hindered by trifurcation.  (Pl.'s Opp'n (#117) 4:22–5:6).  The Special Administrator also fears that if jurors are told that they will have to come back if they find California Casualty liable, and again if they find punitive damages appropriate, the jury will be influenced to find for California Casualty to get out of jury duty earlier.  (*Id.* at 5:7–24).

In Nevada, "the trier of fact shall make a finding of whether [punitive] damages will be assessed.  If such damages are to be assessed, a subsequent proceeding must be conducted before the same trier of fact to determine the amount of such damages to be assessed.  The trier of fact shall make a finding of the amount to be assessed . . . ."  Nev. Rev. Stat. § 42.005(3).  The Court will not trifurcate the trial.  It intends to, however, bifurcate the trial so that the jury determines liability for and the amount of non-punitive damages and liability for punitive damages in phase one.  If the jury finds California Casualty liable for punitive damages, the same jury will determine the amount of punitive damages in phase two.

**C.   California Casualty's motion to exclude evidence of Ramirez's Examination Under Oath and the Declaratory Relief Action**

California Casualty moves to exclude evidence of Ramirez's Examination Under Oath and its declaratory action to determine whether Ramirez was a permissive driver.  (Def.'s Mot. in Limine (# 111, 112, 113) 7:10–17).  California Casualty contends that this evidence is irrelevant because all the alleged harm to Ramirez was due to the six-day delay of California

Casualty's response to Sampson's policy limit demand and that its dispute over whether Ramirez was a permissive driver does not establish bad faith as a matter of law. (*Id.* at 7:17–8:10, 8:25–9:2). California Casualty also contends that the Examination Under Oath and the Declaratory Relief Action should be excluded under Rule 403 of the Federal Rules of Evidence as substantially more prejudicial than probative. (*Id.* at 9:1–7).

As the Special Administrator points out the Court already addressed this issue and held that, though Ramirez's Examination Under Oath and the Declaratory Relief Action do not establish bad faith on their own, they are still relevant to a jury's determination of bad faith. (Order (#94) 9:19–24; Order (#115) 9:21–10:2).   Therefore, the Court will not exclude evidence of Ramirez's Examination Under Oath and the Declaratory Relief Action.

### D.   California Casualty's motion to exclude evidence of its attempt to settle with Owen Fatima for $15,000

California Casualty moves to exclude evidence of its attempt to settle with Owen Fatima for $15,000. (Def.'s Mot. in Limine (# 111, 112, 113) 9:8–19). California Casualty argues that this evidence is irrelevant because it did not affect its ability to pay Ramirez. (*Id.* at 9:20–10:6).

As the Special Administrator points out, the Court has already held that California Casualty's payment to Owen Fatima may be relevant to the jury's consideration of bad faith. (Order (#94) 10:16–11:2; Order (#115) 10:22–11:4).   Therefore, the Court will not exclude evidence of the $15,000 payment to Owen Fatima.

### E.   California Casualty's motion to exclude evidence, testimony, and argument that Ramirez was harmed by the Examination Under Oath, the Declaratory Relief Action, and the $15,000 payment to Owen Fatima

California Casualty moves to prohibit the Special Administrator and her counsel from arguing, testifying, or implying that Ramirez was harmed by the Examination Under Oath, the Declaratory Relief Action, or the $15,000 payment to Owen Fatima. (Def.'s Mot. in Limine (# 111, 112, 113) 10:8–15). California Casualty argues that the only alleged harm to Ramirez is due to the seven-day delay of California Casualty in responding to Sampson's demand

1    letter.  (*Id.* at 10:15–11:3).  The Special Administrator argues that Ramirez was harmed by

2    California Casualty's actions against him.  Specifically, the Special Administrator asserts that

3    California Casualty's payment to Owen Fatima left it without contractual funds to pay

4    Ramirez's judgment.  (Pl.'s Opp'n (#117) 10:1–10).

5         Though it is clear that these events are relevant to the issue of California Casualty's bad

6    faith, it is not clear that these actions led to any harm independent of California Casualty's

7    failure to settle for the policy limit when it had a chance.  Still, it is difficult to see that a

8    reasonable jury could not possibly find any damage to Ramirez based on these actions at this

9    stage.  Therefore, the Court will deny California Casualty's motion to prohibit argument,

10   testimony, and implication that Ramirez was harmed by Ramirez's Examination Under Oath,

11   the Declaratory Relief Action, or the $15,000 payment to Owen Fatima.

12   **F.   California Casualty's motion to exclude evidence not produced during**

13   **discovery**

14        California Casualty moves to exclude evidence not produced during discovery.  (Def.'s

15   Mot. in Limine (# 111, 112, 113) 11:3–26).  The Special Administrator agrees that no party

16   should be allowed to offer evidence not produced during discovery, save for purposes of

17   rebuttal or impeachment.  (Pl.'s Opp'n (#117) 10:10–15).  The Court intends to exclude

18   evidence not produced during discovery except for impeachment and rebuttal.  *See* Fed. R.

19   Civ. P. 37(b)(2)(A), (c)(1).  Even evidence offered for impeachment and rebuttal may be

20   excluded if a party withheld it in the face of a particular discovery request.

21   **G.   California Casualty's motion to prohibit testimony of claims adjusters besides**

22   **Eva Kuhn**

23        California Casualty moves to prohibit the Special Administrator from offering testimony

24   from Miner, litigation specialist Heather Ciechanowski, and claims supervisor Eva Kuhn

25   because their testimony is cumulative.  (Def.'s Mot. in Limine (#111, 112, 113) 12:4–11).

26   California Casualty asks the Court to only allow the Special Administrator to offer the

27   testimony of Eva Kuhn.  (*Id.* at 12:19–28).

28   ///

Cumulative evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, needlessness, or waste of time.  Fed. R. Evid. 403. However, it is not clear at this stage that the testimony of Miner and Ciechanowski would be cumulative or speculative.  In addition, it is clear that Miner was directly involved in handling Sampson's demand letter.  Therefore, California Casualty's motion to prohibit testimony by Miner and Ciechanowski is denied.

**H.   California Casualty's motion to exclude evidence of other lawsuits against it**

California Casualty moves to exclude evidence of other lawsuits against it as impermissible propensity evidence, irrelevant, and collateral to this case.  (Def.'s Mot. in Limine (#111, 112, 113) 13:1–10).  California Casualty correctly argues that past negligence cannot be used to establish negligence in a particular case.  *See* Fed. R. Evid. 404.  However, the Special Administrator asserts that evidence of past lawsuits may be relevant to show California Casualty's pattern and practice of handling claims.  The Special Administrator argues that this could be relevant to the issue of the reasonableness of California Casualty's actions and to the amount of punitive damages assessed.  (Pl.'s Opp'n (#117) 11:5–16).

As to punitive damages, the very case the Special Administrator cites to support her assertion that evidence of prior improper actions may form the basis for an award of punitive damages counsels otherwise.  *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 423 (2003) ("Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis. . . .  Punishment on these bases creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case nonparties are not bound by the judgment some other plaintiff obtains.").  Though the Special Administrator has advanced potential theories of relevance regarding other lawsuits against California Casualty, she has failed to provide any reason why introduction of these other lawsuits is necessary in lieu of simply introducing evidence of California Casualty's past practices.  Furthermore, at oral argument, the parties represented that they have no intention to introduce ///

1    evidence of other lawsuits against California Casualty.   Therefore, the Court will grant

2    California Casualty's motion to exclude evidence of other lawsuits.

3    **I.     California Casualty's motion to prohibit the Special Administrator's counsel**

4    **from offering personal opinions at trial**

5        California Casualty moves to prohibit the Special Administrator's counsel from offering

6    personal opinions at trial.  (Def.'s Mot. in Limine (#111, 112, 113) 13:15–14:10).  Under the

7    Nevada Rules of Professional Conduct, a lawyer shall not "state a personal opinion as to the

8    justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or

9    innocence of an accused . . . ."  Nev. R. of Prof. Conduct 3.4(e).  The Special Administrator's

10   counsel is aware of this rule and does not oppose its enforcement.   (Pl.'s Opp'n (#117)

11   11:17–20).  Therefore, the Court will grant California Casualty's motion to prohibit the Special

12   Administrator's counsel from offering personal opinions at trial.

13   **J.     California Casualty's motion to exclude evidence of settlement offers and**

14   **negotiations**

15       California Casualty moves to prohibit the parties from offering evidence that references

16   settlement or settlement negotiations.  (Def.'s Mot. in Limine (#111, 112, 113) 14:10–16).

17   Evidence of settlement offers or statements made during settlement negotiations is not

18   admissible "to prove liability for, invalidity of, or amount of a claim that was disputed as to

19   validity or amount, or to impeach through a prior inconsistent statement or contradiction." Fed.

20   R. Evid. 408(a).  Such evidence may, however, be admissible for other purposes, such as

21   "proving a witness's bias or prejudice; negating a contention of undue delay; and proving an

22   effort to obstruct a criminal investigation or prosecution."  Fed. R. Evid. 408(b).

23       The Special Administrator agrees that evidence of settlement offers and negotiation

24   between California Casualty and Ramirez and the Special Administrator in this case should

25   be excluded.  But, she argues that evidence of California Casualty's prior payments to the

26   Special Administrator and to Owen Fatima are admissible.  (Pl.'s Opp'n (#117) 11:21–12:7).

27   Because those payments speak to the value and validity of Taputu's estate's claim against

28   Ramirez and not Ramirez's bad faith claim against California Casualty, they are admissible.

13

*See Cal. Union. Ins. Co. v. Liberty Mutual Ins. Co.*, 920 F. Supp. 908, 920 (N.D. Ill. 1996) ("Rule [408] itself states that such evidence is admissible 'for another purpose,' including in subsequent actions to show bad faith by an insurer." (quoting *Civic Fed. Sav. Bank v. Hanover Ins. Co.*, No. 91 C 8286, 1992 WL 188409 at *2 (N.D. Ill. July 29, 1992))), *abrogated on other grounds*, *Prisco Serena Sturm Architects, Ltd. v. Liberty Mut. Ins. Co.*, 126 F.3d 886 (7th Cir. 1997); *Council for the Nat'l Register of Health Serv. Providers v. Am. Home Assurance Co.*, 632 F. Supp. 144, 146 n.1 (D.D.C. 1985).

## IV.  DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT (#137)

California Casualty moves for summary judgment on all the Special Administrator's claims.  Issues of material fact, however, preclude the Court from granting summary judgment for California Casualty.

### A.    Legal Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact and the material lodged by the moving party must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "'[A] material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth.'" *Lynn v. Sheet Metal Workers' Int'l Ass'n*, 804 F.2d 1472, 1483 (9th Cir. 1986) (quoting *Admiralty Fund v. Hugh Johnson & Co.*, 677 F.2d 1301, 1306 (9th Cir. 1982)). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted).  "A mere scintilla of evidence will not do, for a jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation." *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596

14

1   (1993) ("[I]n the event the trial court concludes that the scintilla of evidence presented

2   supporting a position is insufficient to allow a reasonable juror to conclude that the position

3   more likely than not is true, the court remains free . . . to grant summary judgment.").

4   Moreover, "[i]f the factual context makes the non-moving party's claim of a disputed fact

5   implausible, then that party must come forward with more persuasive evidence than otherwise

6   would be necessary to show there is a genuine issue for trial."  *Blue Ridge Ins. Co. v.*

7   *Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998) (citing *Cal. Architectural Bldg. Prods., Inc. v.*

8   *Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987)).  Conclusory allegations that

9   are unsupported by factual data cannot defeat a motion for summary judgment.  *Taylor v. List*,

10  880 F.2d 1040, 1045 (9th Cir. 1989).

11          **B.    Discussion**

12                  **1.    Breach of contract**

13          California Casualty argues that the Special Administrator does not allege that it breached

14  any term of the insurance policy and that it is undisputed that it offered the $15,000 policy limit

15  and defended Ramirez.  (Def.'s Mot. for Summ. J. (#137) 8:8–15).  However, a reasonable jury

16  could conclude that California Casualty breached its duty to defend Ramirez when it took his

17  examination under oath without his attorney present.  Therefore, California Casualty has failed

18  to show that it is entitled to judgment as a matter of law on the Special Administrator's claim

19  for breach of contract.

20                  **2.    Claim for violations of section 686A.310 of the Nevada Revised Statutes**

21          California Casualty argues that the Special Administrator provides no evidence that

22  California Casualty violated section 686A.310, the Nevada Unfair Claims Practices Act.

23  (Def.'s Mot. for Summ. J. (#137) 13:16–16:10).  Section 686A.310 describes various activities

24  that are considered unfair practices and makes insurers liable for any damages resulting from

25  those activities.  Nev. Rev. Stat. § 636A.310.  It does not codify common-law bad faith; it is

26  an independent cause of action.  *Hart v. Prudentual Property & Cas. Ins. Co.*, 848 F. Supp.

27  900, 904–05 (D. Nev. 1994).

28  ///

The Special Administrator alleges California Casualty engaged in the following unfair practices:

> (b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.
> (c) Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies.
> . . . .
> (e) Failing to effectuate prompt, fair and equitable settlements of claims in which liability of the insurer has become reasonably clear.

*Id.* California Casualty argues the Special Administrator has not produced any evidence of these unfair practices or that these practices resulted in any damage to Ramirez. However, a reasonable jury could find that California Casualty failed to act reasonably promptly upon the Special Administrator's communications and failed to act reasonably and fairly in processing her claim once liability was clear. Therefore, the Court denies summary judgment for California Casualty on the Special Administrator's claim for violation of section 686A.310.

### 3. Claims for bad faith and breach of the implied covenant of good faith and fair dealing

Insurance contracts contain an implied covenant of good faith and fair dealing. *Allstate Ins. Co. v. Miller*, 212 P.3d 318, 324 (Nev.2009). "The law, not the insurance contract, imposes this covenant on insurers." *Id.* A violation of the covenant gives rise to a bad-faith tort claim. *Id.*

"To establish a prima facie case of bad-faith refusal to pay an insurance claim, the plaintiff must establish [1] that the insurer had no reasonable basis for disputing coverage, and [2] that the insurer knew or recklessly disregarded the fact that there was no reasonable basis for disputing coverage." *Powers v. United Services Auto. Ass'n*, 962 P.2d 596, 604 (Nev. 1998). The first element is objective while the second is subjective. *See James River Ins. Co. v. Herbert Schenk, P.C.*, 523 F.3d 915, 923 (9th Cir. 2008) (discussing Arizona law). "[I]f an insurer fails to adequately inform an insured of a known reasonable settlement opportunity prior to the filing of a claimant's lawsuit, the insurer may breach its duty of good faith and fair dealing." *Allstate v. Miller*, 212 P.3d 318, 325 (Nev. 2009).

California Casualty argues that its actions are objectively reasonable as a matter of law

based on *Hicks*. (Def.'s Mot. for Summ. J. (#137) 9:16–23). In *Hicks*, Ernest Hicks was in an automobile accident with Ronald Kleckley. 2010 WL 2541175, at *1. Hicks had an insurance policy on his vehicle with Dairyland Insurance Co. ("Dairyland") for $15,000 in liability coverage. *Id.* Kleckley hired Sampson to represent him and Sampson made a claim for damages under Hick's policy. *Id.* An adjustor for Dairyland made several attempts to contact Sampson and Hicks. *Id.* Then, Sampson sent a letter to Dairyland providing an authorization for medical records, listing Kleckley's medical providers, and stating that he will settle for the policy limits provided he receives payment and proof of the limits in two weeks. *Id.* At the time, Kleckley had only been diagnosed with a strain/sprain injury to his neck, back, and right shoulder and his medical bills were $2,120.00. *Id.* About three weeks later, the adjuster sent Sampson a letter acknowledging receipt and stating that she would request the medical records, but that she could not offer the policy limits until she acquired sufficient documentation. The letter also requested medical records. *Id.* at *2. Hicks was never informed of the settlement offer. *Id.* About three weeks later, after discovering the greater seriousness of Kleckley's injury, Dairyland sent Sampson a letter offering to settle for the policy limits. *Id.* at *3. Kleckley now refused to settle for the policy limits. *Id.* Sampson also attempted to get Hicks and Dairyland to stipulate to assignment of Hicks' rights against Dairyland to Kleckley and Dairyland to stipulate to a judgment in excess of the policy limits but Hicks and Dairyland refused. *Id.* In a state court action, judgment was entered for Kleckley against Hicks for $110,540.40 and Dairyland paid its $15,000 policy limit. *Id.*

Hicks and Kleckley then sued Dairyland alleging claims for breach of contract, breach of the covenant of good faith and fair dealing, bad faith, violations of Nevada's Unfair Claims Practices Act, and fraud. *Id.* at *4. The court held that, as a matter or law, Dairyland acted reasonably in handling the claim. *Id.* at *8. The court reasoned that Sampson sent the demand letter before he knew the policy limits and before Dairyland was aware of the full extent of Klecley's injuries and that Dairyland's delay in responding was reasonable given the time it takes to get a fax to the right person within the organization and the intervening labor Day holiday. *Id.* at *9. The court held that it was not bad faith to fail to inform Hicks of

Kleckley's settlement demand because the demand was unreasonable and Hicks could not have paid it. *Id.* at *12. The court reasoned that the demand was unreasonable because it was for the unknown policy limit at a time when Kleckley's medical costs only totaled $2,120. *Id.* The court reasoned that Hicks could not pay the demand because he was homeless, had nothing at the time, and was living day-to-day. *Id.* The court further held that Dairyland had no duty to stipulate to an excess judgment agreement and thus it was not bad faith for Dairyland to refuse to do so. *Id.* at *12–13 (citing *Allstate v. Miller*, 212 P.3d 318, 330–31 (Nev. 2009)).

The time California Casualty took to respond to Sampson's demand letter was reasonable. Sampson unilaterally imposed a two-week deadline. California Casualty only exceeded this deadline slightly. The lapse in time was due to California Casualty moving offices and the fact that Miner did not notice the list of medical providers Sampson had provided in his letter. There is no evidence that California Casualty delayed its response to Sampson's demand in bad faith. California Casualty believes that Sampson did not know the policy limits when he sent the demand letter, but admits that it does not know this and cites to no evidence in support of this. (Def.'s Mot. for Summ. J. (#137) 10:18–22). *Hicks* further suggests that California Casualty's refusal to stipulate to excess judgment is not bad faith.

However, *Hicks* does not control whether California Casualty acted in bad faith in failing to inform Ramirez of Sampson's settlement offer. It is not clear in this case that Sampson's settlement offer was unreasonable. In *Hicks*, the policy limit far exceeded the injured's medical costs at the time of the demand. In this case, the inured's medical costs likely far exceeded the policy limit at the time of the demand because Taputu was severely injured and comatose. California Casualty was aware, at least to some degree, of the extent of Taputu's injuries. Furthermore, California Casualty has not provided evidence that shows that Ramirez could not tender $15,000 if he wished to accept Sampson's offer of settlement. Therefore, California Casualty is not entitled to judgment as a matter of law on the Special Administrator's claim for bad faith. Indeed, the Court has already held that jury questions exist as to the reasonableness of California Casualty's actions. (Order (#94) 8:3–12, 9:20–24, 10:19–11:2,

1  12:24–13:4, 13:9–15).

2  ## V. PLAINTIFF'S MOTION TO AMEND CAPTION (#148)

3       The Special Administrator moves to amend the caption to properly name the new special

4  administrator of Taputu's estate, Cindy Charyulu.   (Pl.'s Mot. to Amend Caption (#148)

5  1:18–21).

6       The Court has not found any case law on the standard for amending captions. California

7  Casualty argues that Rule 15 of the Federal Rules of Civil Procedure's "free" standard for

8  amendment governs this motion.   (Def.'s Opp'n (#152) 8:13–22).   California Casualty is

9  incorrect for two reasons. First, Rule 15 governs amendment of pleadings in the absence of

10  a order setting deadlines for amendment. *See* Fed. R. Civ. P. 15(a)(2).   When, as in this

11  case, the Court has issued a scheduling order that has passed, amendment may only be

12  made "for good cause and with the judge's consent" under Rule 16.  Fed. R. Civ. P 16(b)(4);

13  *see Senich v. American-Republican, Inc*, 215 F.R.D. 40 (D. Conn. 2003).  Second, the Special

14  Administrator is not really moving to amend the complaint.  She does not move to add a party,

15  a claim, or any allegations.  She simply wishes to have the caption reflect that Charyulu is now

16  the special administrator of Taputu's estate.

17       The Special Administrator is a plaintiff in this action only in her capacity as special

18  administrator of Taputu's estate.   The parties had until June 15, 2009 to amend their

19  pleadings and add parties. (Scheduling Order (#133) 2:1–2).  On May 24, 2010, the probate

20  court entered an order substituting Cindy Charyulu as the special administrator of the Taputu's

21  estate.  (Probate Order, attached as Ex. 1 to Pl.'s Mot. to Amend Caption (#148)).  Charyulu

22  is a representative of University Medical Center ("UMC"), the main creditor of Taputu's estate.

23  (Id. at ¶ 9).

24       California Casualty opposes the motion, arguing that the motion is untimely and there

25  is a conflict of interest between UMC and the estate.  (Def.'s Opp'n (#152) 8:2–11:10).

26  California Casualty argues that the Special Administrator had no justification to move for

27  substitution in the probate court at such a late hour and that Charyulu, as representative of

28  the estate's main creditor, cannot represent the estate. Essentially, California Casualty attacks

1  the probate court's substitution of Charyulu rather than the Special Administrator's motion to

2  amend the caption.  (*Id.* at 8:23–9:10).  The probate court has ordered that Charyulu be

3  substituted as special administrator of Taputu's estate.  The Special Administrator's motion

4  to amend the caption to reflect this is not an invitation for California Casualty to reargue the

5  probate petition and this Court is not sitting in appellate review of the probate court.  The

6  Special Administrator has given a justification for amending the caption—Pasina is not longer

7  the special administrator.  The Court will grant the Special Administrator's motion to amend

8  the caption.[2]

9  **VI.  DEFENDANT'S MOTION TO DISMISS (#153)**

10      California Casualty moves to dismiss this action because alleged fraud in manufacturing

11  this cause of action by Sampson, collusion between UMC and Sampson, and problems with

12  the assignment of the cause of action from Ramirez to the Special Administrator.  California

13  Casualty has not provided any authority or reason as to why alleged ethical violations by

14  Sampson or breaches of fiduciary duties by the Special Administrator or Charyulu should

15  result in dismissal.  Furthermore, California Casualty has failed to show that Ramirez's

16  assignment to the Special Administrator is void.  Therefore, the Court denies California

17  Casualty's motion to dismiss.

18      **A.    Sampson's alleged scheme to fraudulently manufacture a bad faith claim**

19      California Casualty argues that this case must be dismissed because Sampson

20  fraudulently orchestrated the events leading up to it and is controlling Ramirez, the Special

21  Administrator, and Charyulu.  (Def.'s Mot. to Dismiss (#153) 11:10–23).  California Casualty

22  believes that Sampson manufactured this bad faith action by: (1) setting an arbitrary two-week

23  deadline on his settlement offer; (2) refusing to provide California Casualty with medical

24  records; (3) rejecting California Casualty's offer of settlement for the policy limits one week

25  after his deadline; (4) obtaining a judgment against Ramirez in excess of the policy limits; (5)

26

27  _____

28      [2] California Casualty also argues that it will be prejudiced by the addition of a new
witness.  (Def.'s Opp'n (#152) 9:8–11).  There is no indication, however, that Charyulu will be
a witness.

20

getting Ramirez to assign his bad faith claim against California Casualty to the Special Administrator; and (6) attempting to have California Casualty sign the agreement where Ramirez assigned his claims to the Special Administrator while the Special Administrator agreed not to execute the judgment against him for 20 years, or forever if California Casualty signed.  (*Id.* at 11:23–12:12; Def.'s Reply (#169) 7:16–8:3).

The circumstances of the case do suggest that Sampson may have planned for a bad faith claim against California Casualty before he sent the demand letter.  There is no other apparent reason for Sampson, while representing the Special Administrator, to reject the offer of settlement for the policy limits that he himself had made but one week earlier.  And, there is no other apparent reason why he would seek judgment against Ramirez, who was in prison and would presumably have great difficulty in paying.

But, California Casualty cannot lump all the blame for the present bad faith action on Sampson's machinations.  California Casualty asserts that Sampson purposely refused to provide Taputu's medical records to make it impossible for it to accept the settlement offer in time.  (*See* Def.'s Mot. to Dismiss (#153) 12:5–6, 12:24–26).  But, the record clearly shows that California Casualty requested medical records *or* a signed medical authorization form.  Sampson provided a signed authorization form and a list of medical providers.  Sampson complied with California Casualty's request.  It was Miner, California Casualty's employee, who failed to notice the list of providers and attempted to obtain medical records even though she already had everything she needed to check Taputu's medical costs.  In addition, the Special Administrator alleges further impropriety by California Casualty in the Examination Under Oath of Ramirez and attempt to settle with Owen Fatima.

Furthermore, though there is no apparent reason that the Special Administrator initially offered to settle for the policy limits and then refused one week later, California Casualty has pointed to no authority that states a litigant must provide a reason to accept or decline a settlement offer.  It seems clear that the damages of the case against Ramirez were in excess of the policy limit.  Though Ramirez's ability to pay is uncertain, it is not just to find fraud

///

21

1   simply because a litigant refused to settle for an amount far below the reasonably expected

2   damages.[3]

3        California Casualty apparently argues that Sampson has taken too much control of this

4   case and that his clients—Ramirez, the Special Administrator, and Charyulu—are mere

5   pawns.  (Def.'s Mot. to Dismiss (#153) 13:4–18).  California Casualty cites to deposition

6   transcripts showing that Ramirez, the Special Administrator, and Charyulu's knowledge of the

7   facts surrounding this bad faith action is lacking and that Sampson repeatedly asserts the

8   attorney-client privilege to prevent them from testifying about certain matters.  (*Id.* at

9   13:19–16:20).  California Casualty, however, provides no authority or logical reason why a

10  plaintiff must have detailed knowledge of a cause of action and the facts surrounding it.  If

11  California Casualty believes Sampson improperly asserted the attorney-client privilege, that

12  may be dealt with through other means.  California Casualty has failed to provide a reason

13  why alleged improper assertion of the attorney-client privilege should result in dismissal for

14  fraud.

15       Next, California Casualty argues that Sampson's representation of Ramirez results in a

16  conflict of interest because Sampson represented the Special Administrator in her suit against

17  Ramirez,[4] rejected California Casualty's offer to settle the Special Administrator's claim

18  against Ramirez for $15,000, represented the Special Administratorna and Ramirez when

19  Ramirez assigned his bad faith claim against California Casualty to the Special Administrator,

20  and refused to allow negotiations between UMC and California Casualty to reduce Taputu's

21  estate's judgment against Rmirez even though it would benefit Ramirez.  (Def.'s Mot. to

22  Dismiss (#153) 17:5–18:22).

23       It is possible that Sampson has a conflict of interests that violates the Nevada Rules of

24  Professional Conduct.  *See* Nev. R. Prof. Conduct 1.7, 1.8, 1.9 (rules regarding conflicts of

25  _____

26       [3] The Special Administrator also argues that she did not receive proof that no other
    coverage was available, as requested in the demand letter, until five months after the offer
27  was made.  (Pl.'s Opp'n (#160) 10:1–17).

28       [4] The Special Administrator notes that Ramirez had independent counsel when he
    negotiated the agreement with her.  (*See* Pl.'s Opp'n (#160) 16:9–23).

1    interest).  However, California Casualty has failed to show why Sampson's conflict of interest

2    should result in dismissal of this action.   Furthermore, California Casualty believes that

3    Sampson has a conflict in large part due to his alleged representation of UMC.  (Def.'s Reply

4    (#169) 3:16–4:11)).  UMC is not even a party to this case except to the extent that Charyulu

5    acts as special administrator and also works for UMC.[5]

6        California Casualty cites *DeLaune v. Liberty Mutual Ins. Co.*, 314 So. 2d 601 (Fla. Ct.

7    App. 1975), to show that courts disapprove of attorney's using brief deadlines to set up bad

8    faith claims.  (Def.'s Mot. to Dismiss (#153) 18:23–19:20).  The court in *DeLaune* noted that

9    the plaintiff's attorney's arbitrarily short deadline for acceptance of his offer to settle for the

10   policy limits and his refusal to accept the policy limits the following Monday after the deadline

11   suggested that the attorney may have been setting up a bad faith claim.  314 So. 2d at 603.

12   The court, however, found that the plaintiff had provided no evidence of negligence and so

13   the trial court's instruction that negligence cannot be considered in a bad faith claim was non-

14   prejudicial.  It did not find that the plaintiff's attorney had in fact set up the cause of action and

15   did not discuss what consequences such action would have.  *Id.* at 602–03.

16       California Casualty also cites *Pruyn v. Agricultral Ins. Co.*, 42 Cal. Rptr. 2d 295 (Cal.

17   Ct. App. 1995).  The court in *Pruyn* notes that "a stipulated or consent judgment which is

18   coupled with a covenant not to execute against the insured brings with it a high potential for

19   fraud or collusion."  *Id.* at 305.  This was relevant to the court because a stipulation judgment

20   entered by the insured would only bind the insurer absent fraud or collusion.  *Id.*  The court

21   noted that "Merely because plaintiff's complaint is based upon a judgment which was entered

22   pursuant to a stipulation and was accompanied by a covenant not to execute, it does not

23   follow that the defendant insurers were entitled to the dismissal granted by the trial court."  *Id.*

24   at 308.  Whether the Special Administrator's consent judgment against Ramirez is binding on

25   ///

26   _____

27       [5] The Special Administrator asserts that there is no conflict of interest between UMC,
     as creditor of the estate, and the estate.  (Pl.'s Opp'n (#160) 6:13–26).  Though both UMC and
28   the estate would like to fully satisfy the estate's judgment against Ramirez, there interests are
     clearly in conflict.  UMC, as a creditor, seeks to diminish the estate.

1   California Casualty is not presently at issue.  Instead, the Court must determine if Sampson

2   manufactured this bad faith claim, and if so, what is the appropriate response.

3          California Casualty further cites *Pavia v. State Farm Mutual Automobile Insurance Co.*,

4   626 N.E.2d 24 (N.Y. 1993).  Though the court in *Pavia* rested its holding that an insurer's

5   failure to timely accept a policy limit settlement subject to the plaintiff attorney's arbitrary

6   deadline was not bad faith in part on the policy consideration of avoiding incentives to

7   manufacture bad faith claims, *id.* at 28–29, it did not address what the legal consequences of

8   an attorney manufacturing such a claim would be.

9          Finally, California Casualty relies on *AAA Nevada Ins. Co. v. Chau*, No. 08-cv-00827,

10  2010 WL 2802164 (D. Nev. July 15, 2010).  The court in this case notes that Sampson's law

11  firm has a pattern of attempting to manufacture bad faith claims with demand letters that give

12  arbitrary deadlines.  *Id.* at * 4 n.1.  Though the court held that failure to settle within the

13  arbitrary deadline was not bad faith, it did not consider the consequences of the firms attempts

14  to manufacture the claim.

15         In sum, though the Court does not condone the manufacture of bad faith claims, no

16  authority has been presented that the remedy for a plaintiff attorney's alleged machinations

17  to create a more favorable cause of action is dismissal.  If the case in fact lacks merit, it

18  should be dismissed.  If it is in fact frivolous, the attorney should be sanctioned.  But the Court

19  will not dismiss this case simply because Sampson appeared to engage in sharp practices.

20  **B.    UMC and Sampson's alleged collusion with UMC to appoint Charyulu as**

21  **special administrator of Taputu's estate**

22         California Casualty argues for dismissal because Sampson allegedly colluded with UMC

23  to appoint Charyulu as special administrator of Taputu's estate despite a conflict of interest

24  between the estate and UMC.[6]  (Def.'s Mot. to Dismiss (#153) 20:23–22:12).  But, California

25  Casualty provides no reason why this collusion, if true, requires dismissal of this action.  If

26  _____

27         [6] The Special Administrator states that the probate court denied California Casualty's
    motion to revoke the appointment of Charyulu as special administrator of Taputu's estate and
28  informed California Casualty that a creditor of an estate may serve as administrator.  (Pl.'s
    Opp'n (#160) 20:13–19).

1    Sampson breached his professional duties or the Special Administrator or Charyulu breached

2    their fiduciary duties as administrators, then the injured parties may pursue legal action

3    against them.  If the probate court erred in appointing Charyulu, the remedy lies in appeal in

4    the Nevada courts.[7]   The Court will not dismiss the complaint because of alleged collusion

5    by Sampson and UMC to appoint Charyulu as special administrator of Taputu's estate.

6         **C.    Alleged defects in Ramirez's assignment of his cause of action to the Special**

7              **Administrator**

8         California Casualty argues that dismissal is required because the assignment of Ramirez

9    to the Special Administrator of his claims against California Casualty is void if Pasina no

10   longer serves as special administrator.  (Def.'s Mot. to Dismiss (#153) 22:13–23:25).  The

11   assignment stated:

12           If at any point in time, whether prior to or after the date of this assignment,
             Kamila Pasina, as Special Asministrator for the Estate of Fatu Taputu is
13           permanently dismissed from the action against California Casualty Indemnity
             Exchange, Case No.: 2:08-cv-1199 RCJ-RJJ, then this assignment is rendered
14           null and void from its inception.

15   (Assignment dated Oct. 2009, attached as Ex. E to Def.'s Mot. to Dismiss (#153))

16   (capitalization altered).

17        California Casualty argues that the substitution of Charyulu as special administrator

18   qualifies as a permanent dismissal of Pasina, as special administrator.  The Court disagrees.

19   The assignment clearly went to Pasina in her capacity as administrator and the most

20   reasonable reading is that substitution of a new administrator would not count as a dismissal.

21        California Casualty also argues that the assignment is void for lack of consideration.

22   (Def.'s Mot. to Dismiss (#153) 23:22–23:25).  In some jurisdictions, lack of consideration does

23   not render an assignment void.  *See, e.g., In re Maker*, 142 B.R. 734, 741 (Bankr. W.D. Pa.

24   1992) (applying Pennsylvania law).  In others, though assignments are usually treated like

25   contracts and must be supported by consideration, assignments may be made by gift.  *See,*

26   *e.g., MHI Shipbuilding, LLC v. Nat'l Fire Ins. Co. of Hartford*, 286 B.R. 16, 32 (D. Mass. 2002)

27   ───────────────

28        [7] The Special Administrator notes that the appointment of a creditor as an administrator
     of an estate is expressly authorized by statute.  *See* Nev. Rev. Stat. 139.040(h).

(applying Massachusetts law).  Some jurisdictions find valid assignments absent consideration if delivery occurs.  *See In re Kelton Motors, Inc.*, 97 F.3d 22, 27–28 (2d Cir. 1996).  Others hold that an assignment is irrevocable if made for valuable consideration or a writing or delivery evidences irrevocablility.  *See Huff v. Nationwide Ins. Co.*, 167 B.R. 53, 60 (Bankr. W.D. Pa. 1992), *aff'd*, 989 F.2d 487 (3d Cir. 1993).  The Restatement allows for gratuitous assignments, but notes that they will generally be revocable.  *See* Restatement (2d) of Contracts § 332 (1981).  In sum, contract principles govern whether an assignee may enforce assignment by an assignor.  However, a valid contract need not exist for a assignee to enforce an obligation against the obligor.  *See Nat'l Reserve Co. of Am. v. Metropolitan Trust Co. of Cal.*, 112 P.2d 598, 601 (Cal. 1941) ("It is well established that an assignment of a chose in action for collection vests the legal title in the assignee whether or not any consideration is paid therefor.  In such case the assignee may maintain a suit thereon in his own name, even though the assignor retains an equitable interest in the thing assigned.").

California Casualty cites *May v. Anderson*, 119 P.3d 1254 (Nev. 2005), for the proposition that assignments are governed by contract principles in Nevada.  *May*, however, involved specific enforcement of a settlement agreement.  *Id.* at 1257.  The court did not consider the validity of any assignment.[8]  Though the Special Administrator seems to accept that an assignment is invalid absent consideration, the Court has found no authority that suggests an assignment must be supported by consideration in Nevada.

California Casualty notes that Ramirez does not remember getting anything in exchange for signing the agreement of October 7, 2009.  (Def.'s Mot. to Dismiss (#153) 23:8–16).  Furthermore, it notes that the Special Administrator's promise not to execute the judgment for 20 years cannot be consideration because the Special Administrator already promised to do this in the agreement of July 28, 2007.  (*Id.* at 23:16–25).  The Special Administrator argues that consideration exists in her promise to pursue Ramirez's claims against California

---

[8] Though this Court, in dicta, implied otherwise in *Hicks v. Dairyland*.  2010 WL 2541175, at *5–6.  The Court now retreats from that implication.

1    Casualty.  (Pl.'s Oppn' (#160) 3:4–17).[9]

2        But, no consideration is needed for Ramirez's assignment to the Special Administrator

3    to be valid.  Even if consideration was needed, it may be found here.  The original assignment

4    was held insufficient by this Court.  Therefore, whether the Special Administrator was still

5    obligated under it could be in reasonable dispute.  If the assignment failed, the Special

6    Administrator could not pursue relief against California Casualty, which frustrates the purpose

7    of the assignment.  In the October assignment, Ramirez assigned his claim against California

8    Casualty in exchange for the Special Administrator's new promise to pursue them against

9    California Casualty and to not execute judgment against Ramirez.  Therefore, the Court will

10   not dismiss this action based on a finding that Ramirez's assignment was invalid for lack of

11   consideration.

12                    **VII. DEFENDANT'S MOTION FOR SANCTIONS (#154)**

13       California Casualty moves for sanctions against the Special Administrator's attorneys

14   under Rule 11 of the Federal Rules of Civil Procedure.  (Def.'s Mot. for Sanctions (#154)

15   23:25–24:13).  Rule 11 requires attorneys to sign pleadings, motions, and other papers

16   presented to the court in order to certify that:

17           (1) it is not being presented for any improper purpose, such as to harass, cause
             unnecessary delay, or needlessly increase the cost of litigation;
18           (2) the claims, defenses, and other legal contentions are warranted by existing
             law or by a nonfrivolous argument for extending, modifying, or reversing existing
19           law or for establishing new law;
             (3) the factual contentions have evidentiary support or, if specifically so
20           identified, will likely have evidentiary support after a reasonable opportunity for
             further investigation or discovery; and
21           (4) the denials of factual contentions are warranted on the evidence or, if
             specifically so identified, are reasonably based on belief or a lack of information.
22
     Fed. R. Civ. P. 11(b).
23
         California Casualty argues that the Special Administrator lacks any evidence of bad faith,
24
     suggesting that Sampson brought this action for an improper purpose.  (Def.'s Mot. to Dismiss
25
     (#152) 24:14–25).  This is not the case.  There is evidence of bad faith: the request for
26

27       ⁹ The Special Administrator also cites many cases for the proposition that the
28   consideration clause in the assignment was valid.  (Pl.'s Opp'n (#160) 3:4–17).  A
     consideration clause cannot substitute for actual lack of consideration.

1   medical records when California Casualty already had an authorization; the examination of

2   Ramirez without his counsel present; the attempts to circumvent the estate and settle claims

3   with Owen Fatima; the failure to notify Ramirez of the settlement offer; as well as the delay in

4   responding to the demand letter itself—though this was likely reasonable.  Simply put, the

5   Special Administrator's action has some evidentiary basis for her claims.

6       Furthermore, California Casualty fails to understand Rule 11.  Rule 11 offers sanctions

7   for violations of the above-listed certifications of a pleading, motion, or paper presented to the

8   court.  California Casualty does not identify any specific paper or pleading that it thinks

9   violates Rule 11.  Nor does California Casualty show any evidence that is has complied with

10  Rule 11's safe harbor provision. *See* Fed. R. Civ. P. 11(c)(2).  Nor has it complied with Rule

11  11's explicit statement that "[a] motion for sanctions must be made separately from any other

12  motion and must describe the specific conduct that allegedly violates Rule 11(b)."  Fed. R.

13  Civ. P. 11(c)(2).  Therefore, the Court denies California Casualty's motion for sanctions.

14                      **VIII.  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (#159)**

15      California Casualty moves for summary judgment that Ramirez's October 7, 2009

16  assignment is invalid.  (Def.'s Mot. for Summ. J. (#159) 1:20–24).  California Casualty makes

17  the same arguments it made in its motion to dismiss: that, by the assignment's own terms, it

18  is void if Pasina is dismissed from this action and that the assignment is void for lack of

19  consideration.  (*Id.* at 1:24–25).  California Casualty does not provide any new authority or

20  material facts that would alter the analysis above.  Therefore, the Court denies California

21  Casualty's motion for summary judgment that Ramirez's October 7, 2009 assignment is

22  invalid.

23                      **IX.  DEFENDANT'S EMERGENCY MOTION TO COMPEL (#164)**

24      California Casualty moves the Court for an emergency motion to compel Pasina to

25  answer questions regarding this action.  (Def.'s Mot. to Compel (#164) 1:16–21).  California

26  Casualty states that during its deposition of Pasina, she did not answer questions about the

27  basis for the two-week deadline in the demand letter, why she refused to provide medical

28  records, and why she refused to later accept the policy limit as settlement because Sampson

instructed her that the answers were protected by the attorney-client privilege. (*Id.* at 2:22–3:4). California Casualty argues that Pasina must be compelled to provide answers to these questions because they will be relevant to her action against it as well as its defense that Sampson manufactured the bad faith action through fraud and collusion. (*Id.* at 5:8–13). It appears that Sampson allowed Pasina to answer based on her independent knowledge, but instructed her not to answer when the examination turned to communications between her and Sampson. (*See id.* at 7:12–19).

California Casualty's first argument, in what is becoming a pattern, shows a misunderstanding of the law. Relevancy of communications between a party and her attorney does not remove the protections of the attorney-client privilege. If it did, the privilege would be practically useless.

California Casualty also argues that the attorney-client privilege does not apply because only Pasina and Sampson know their true motives in pursuing this bad faith claim against California Casualty. (Def.'s Mot. to Compel (#164) 8:8–16). California Casualty provides no authority as to why this would destroy the privilege. If the Special Administrator cannot succeed on her claim without revealing privileged information, then that choice is hers to make. Furthermore, the bad faith of California Casualty is at issue. Sampson and Pasina's motivations for the bad faith claim are not.

California Casualty finally argues that Sampson waived the attorney-client privilege when he testified at his deposition that Pasina told him she would not accept the policy limit settlement because she did not know what other insurance coverage was available. (Def.'s Mot. to Compel (#164) 8:2–8). The Special Administrator does not argue otherwise. Assuming Sampson was authorized to make this statement by Pasina, he has waived the privilege. *See In re von Bulow*, 828 F.2d 94, 100–01 (2d Cir. 1987) ("An attorney may not waive the privilege without his client's consent. . . . A client may nonetheless by his actions impliedly waive the privilege or consent to disclosure."). "[T]estimony as to part of a privileged communication, in fairness, requires production of the remainder." *Id.* at 102. The waiver only extends to communications about the matter disclosed. *Chevron Corp. v. Pennzoil Co.*, 974

29

F.2d 1156, 1162 (9th Cir. 1992).  Thus, if authorized, Sampson waived the privilege as to the contents of his conversation with Pasina regarding acceptance of California Casualty's policy limit offer.  This covers some, but not all, of the questions California Casualty wishes to ask Pasina.

The Special Administrator argues that all these questions are not reasonably calculated to lead to discoverable evidence.  (Pl.'s Opp'n (#166) 2:1–2).  As discussed above, Pasina's motivation for refusing to accept the settlement offer are not material.  The key issue in this case is whether California Casualty acted unreasonably in handling the Special Administrator's claim.

In sum, though Sampson likely waived the attorney-client privilege regarding his conversation with Pasina about rejecting the policy limits offer, Pasina's answers to questions about why she rejected the offer are not relevant to this case.  Therefore, the Court denies California Casualty's motion to compel.  However, the Court notes that Pasina must answer questions about her own knowledge of the relevant events and whether or not she instructed Sampson to impose a two-week deadline in the demand letter.

## X.  DEFENDANT'S SECOND MOTION IN LIMINE (#174)

### A.   California Casualty's motion to exclude evidence of the June 27, 2007 agreement[10]

California Casualty moves to exclude evidence that it failed to execute a June 27, 2007 agreement as irrelevant and substantially more prejudicial than probative.  (Def.'s 2d Mot. in Limine (#174) 6:16–9:25).  In the agreement, Ramirez agreed to stipulate to liability and not contest Taputu's claims for damages of at least $800,000.  He also agreed to cooperate with the estate in pursuing claims against California Casualty with the sums recovered held in trust for Taputu's estate.  The estate agreed not to execute the stipulated judgment for 20 years.  The agreement stated that if California Casualty also executed the agreement, then the estate would not execute the judgment at all.  The agreement also contained recitals that suggested

---

[10] In an apparent typo, California Casualty refers to a June 27, 2010 agreement.

1  bad faith on the part of California Casualty. (Agreement dated June 27, 2010, attached as Ex.

2  A to (Def.'s 2d Mot. in Limine (#174)).

3      California Casualty argues that its failure to execute the agreement cannot legally be the

4  basis for bad-faith liability. As the Court has held, and as discussed above, the failure to

5  execute the agreement cannot be bad faith alone, but may be relevant to a jury determination

6  of bad faith.

7      California Casualty also argues that its failure to execute the agreement is highly

8  prejudicial because the jurors will not understand the agreement and its possible use as a set

9  up for a bad faith claim against California Casualty. (Def.'s 2d Mot. in Limine (#174) 9:1–25).

10 Simply put, it is the job of California Casualty's lawyers to educate the jury on its reasons for

11 not signing the agreement. California Casualty may present its case and show that it acted

12 reasonably in not signing the agreement. No undue prejudice will result. The Court will deny

13 California Casualty's motion to exclude evidence that it failed to execute a June 27, 2007

14 agreement.

15     **B.    California Casualty's motion to exclude evidence of Ramirez's assignments**

16         **to the Special Administrator**

17     California Casualty moves to exclude evidence of allegedly void assignments. It argues

18 Ramirez's assignments of his claims against it to Taputu's estate are void for lack of

19 consideration and because Pasina is no longer the special administrator. (Def.'s 2d Mot. in

20 Limine (#174) 10:1–13:15). For the reasons discussed above, these arguments fail. The

21 Court denies California Casualty's motion to exclude evidence of Ramirez's assignments to

22 the Special Administrator.

23     **C.    California Casualty's motion to exclude references to its financial condition**

24         **before punitive damages are awarded**

25     California Casualty moves to prohibit references to its financial condition unless punitive

26 damages are awarded. (Def.'s 2d Mot. in Limine (#174) 13:15–14:13). California Casualty's

27 financial condition is irrelevant to any issue in the first state of the trial, but is relevant to the

28 second stage where the jury will determine the amount of punitive damages. This follows

31

1   Nevada law.  *See* Nev. Rev. Stat. § 42.005.  Therefore, the Court grants California Casualty's

2   motion to exclude references to its financial condition until the jury determines that punitive

3   damages are warranted.

4        **D.   California Casualty's motion to exclude evidence of its conduct in the present**

5             **litigation after judgment was entered against Ramirez**

6        California Casualty moves to exclude evidence of its conduct that occurred after

7   judgment was entered against Ramirez and it paid its policy limits toward the judgment as

8   irrelevant and privileged.  (Def.'s 2d Mot. in Limine (#174) 14:15–18:20).  The Special

9   Administrator argues such evidence is admissible because California Casualty's conduct was

10  harassing and disrespectful to the Court and constitutes bad faith against Ramirez.  (Pl.'s

11  Opp'n (#178) 8:24–28).

12       It is likely that much of California Casualty's conduct after it paid out the policy limits is

13  irrelevant to the remaining issues in this case.  However, it is difficult for the Court to

14  categorically exclude all such conduct as irrelevant.  This determination is better left for trial

15  where the Court can evaluate specific offers of evidence.

16       However, California Casualty's conduct in this present litigation should be excluded.

17  California Casualty is allowed to pursue its defense wrongheadedly if it so chooses.  *See Cal.*

18  *Physicians' Serv. v. Superior Court*, 12 Cal. Rptr. 2d 95, 96–97 & n.2 (Cal. Ct. App. 1992)

19  ("Broadly but nevertheless accurately speaking, there is no tort of 'malicious defense.'").  If

20  opposition to bad faith insurance claims could be used as evidence of the insurer's bad faith,

21  a perverse incentive would be created for insurer's to capitulate even to frivolous suits.

22  Furthermore, the Special Administrator may challenge California Casualty's conduct in this

23  action through sanctions available under the Rules of Civil Procedure.

24       Though the Court cannot say that California Casualty's conduct in this litigation is

25  absolutely irrelevant to whether it acted in bad faith surrounding Taputu's claim against

26  Ramirez, the small probative value of such evidence is substantially outweighed by the

27  potential for prejudice and waste of time.  Therefore, under Rule 403, the Court will exclude

28  evidence of California Casualty's conduct in this litigation but will not exclude reference to

1  California Casualty's conduct after the judgment against Ramirez.

2  **XI. DEFENDANT'S RENEWED MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL (#175)**

3  California Casualty moves to disqualify Sampson and any attorney at the Christensen

4  Law Offices from serving as plaintiff's counsel. (Def.'s Mot. to Disqualify (#175) 1:16–22).

5  California Casualty argues that Sampson is a key witness in this case. (*Id.* at 2:16–17).

6  California Casualty has raised this argument ad nauseam. It deserves no further

7  consideration. If California Casualty wants to file an action against Sampson or the Special

8  Administrator for malicious prosecution, it presumably may do so. But, the facts of this case

9  are undisputed. The motivations of Sampson and the Special Administrator are irrelevant.

10 As discussed above, the issue is whether California Casualty acted reasonably in handling

11 Taputu's claim against Ramirez. Sampson may act as trial counsel. The Court denies

12 California Casualty's renewed motion to disqualify Sampson and his firm.

13 **XIII. CONCLUSION**

14 Accordingly, IT IS ORDERED that Plaintiff's Motion to Strike Expert Witness (#72) is

15 DENIED as MOOT.

16 IT IS FURTHER ORDERED that Defendant's Motion in Limine (#111, 112, 113) is

17 GRANTED IN PART AND DENIED IN PART.

18 IT IS FURTHER ORDERED that evidence not produced in response to discovery

19 requests is excluded and evidence not produced during discovery is excluded save for the

20 purpose of impeachment or rebuttal.

21 IT IS FURTHER ORDERED that evidence of other lawsuits against California Casualty

22 is excluded.

23 IT IS FURTHER ORDERED that counsel are prohibited from offering impermissible

24 personal opinion at trial.

25 IT IS FURTHER ORDERED that Defendant's Renewed Motion for Summary Judgment

26 (#137) is DENIED.

27 IT IS FURTHER ORDERED that Plaintiff's Motion to Amend Caption (#148) is

28 GRANTED.

The Clerk of the Court shall amend the caption so that the plaintiff is "Cindy Charyulu, as Special Administrator for the Estate of Fatu Taputu."

IT IS FURTHER ORDERED that Defendant's Counter Motion to Dismiss (#153) is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion for Sanctions (#154) is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment (#159) is DENIED.

IT IS FURTHER ORDERED that Defendant's Emergency Motion to Compel (#164) is DENIED.

IT IS FURTHER ORDERED that Defendant's Second Motion in Limine (#174) is GRANTED IN PART AND DENIED IN PART.

IT IS FURTHER ORDERED that the parties shall not refer to Defendant's financial condition unless the jury decides to impose punitive damages at the first stage of the trial.

IT IS FURTHER ORDERED that the parties shall not introduce evidence of California Casualty's conduct in this litigation at trial.

IT IS FURTHER ORDERED that Defendant's Renewed Motion to Disqualify Plaintiff's Counsel (#175) is DENIED.

IT IS SO ORDERED.

DATED: This 28th day of September, 2010.

Robert C. Jones
UNITED STATES DISTRICT JUDGE